*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0193p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

DIANE M. MOON,

　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

UNUM PROVIDENT CORPORATION,

　　　　　　　*Defendant-Appellee.*

No. 03-1626

>

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 02-00683—Robert Holmes Bell, Chief District Judge.

Argued: December 2, 2004

Decided and Filed: March 22, 2005[*]

Before: SILER and CLAY, Circuit Judges; BERTELSMAN, District Judge.[**]

---

## COUNSEL

**ARGUED:** Christopher D. Morris, RYAN, JAMIESON, MORRIS, RYAN & SMITH, Kalamazoo, Michigan, for Appellant. K. Scott Hamilton, DICKINSON WRIGHT, PLLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Christopher D. Morris, RYAN, JAMIESON, MORRIS, RYAN & SMITH, Kalamazoo, Michigan, for Appellant. K. Scott Hamilton, DICKINSON WRIGHT, PLLC, Detroit, Michigan, for Appellee.

　　　CLAY, J., delivered the opinion of the court, in which BERTELSMAN, D. J., joined. SILER, J. (p. 10), delivered a separate dissenting opinion.

---

## OPINION

---

　　　CLAY, Circuit Judge. In this action for long-term disability ("LTD") benefits pursuant to an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, Plaintiff Diane Moon appeals the district court's denial of

---

[*] This decision was originally issued as an "unpublished decision" filed on March 22, 2005. On April 12, 2005, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

her motion for judgment on the administrative record. The district court held that the final decision of Defendant Unum Provident Corporation ("Unum") to uphold the termination of Moon's disability benefits was not arbitrary and capricious. We disagree and REVERSE.

## I. BACKGROUND

Unum is Moon's long-term disability insurer. Moon's insurance plan (the "plan") is sponsored by her employer, Borgess Medical Center ("Borgess"). Moon and Unum agree that the plan vests Unum with discretionary authority to determine eligibility for benefits. The plan defines "disabled" as follows:

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

J.A. 10. At the outset, we note that this appeal concerns only the first requirement of this definition.

Moon worked in a clerical capacity in the admitting department at Borgess. Her title was "business associate" and her duties included typing, filing, and some writing. On June 17, 2000, Moon was admitted to Borgess as a patient due to the onset of various incapacitating symptoms associated with hypertension, i.e., unusually high blood pressure. The symptoms included severe chest pains. The primary diagnoses, as reported in a "Clinical Resume" prepared by Doctor Stephen Reagan, were: (1) atypical chest pain; (2) chronic stage III hypertension; and (3) hypertensive emergency. In addition, Moon was diagnosed with a history of hypertensive emergency and hypertensive crisis. The clinical resume observed: "[t]his is a 39-year-old woman with a history of frequent admissions [to the hospital] for chest pain, who presented to the emergency room with acute onset of left sided atypical and typical features of acute coronary disease." J.A. 8. Dr. Reagan consulted Doctor Robert Lapenna, Moon's hypertension specialist, and the two agreed on June 23, 2000, that after nearly a week in the hospital, Moon could be discharged. However, the conditions of discharge were that Moon receive "VNA home care and [a] prompt followup with her primary care physician, Dr. Stacy Watson, with whom [Dr. Reagan] discussed the case." *Id*.

Chronic hypertension and the related severe chest pains it caused were not Moon's only health problem. Since 1992, she had suffered from progressively-worsening thumb pain. In September 2000, Moon's primary care physician, Dr. Watson, described Moon's thumb pain – which existed in both hands – as "severely limiting [her] activity." J.A. 13.

After her hospitalization in late June 2000, Moon's condition did not improve. Dr. Watson determined that Moon was not able to return to work and on September 16, 2000, Moon filed a claim with UNUM for long term disability benefits. The claim form cited uncontrolled hypertension as the reason for Moon's inability to work. In the Physician's Statement portion of the claim form, Watson explained that Moon suffered from "severe labile hypertension" and, secondarily, from bilateral thumb pain which "severely limit[s]" her activity. J.A. 13. Watson further expressed concern about Moon's excessively high blood pressure and advised that Moon could not exert herself by climbing stairs or remaining active for 1-2 hours without frequent resting. *Id.* at 14. Finally, Watson prohibited Moon from lifting more than 10 pounds and engaging in "strenuous activity with any prolonged walking." *Id*.

On the basis of Watson's diagnosis and instructions, Unum granted Moon's claim, citing a disability onset date of June 17, 2000. In its December 19, 2000 letter, granting Moon's claim, Unum did not explain whether it granted benefits because of the hypertension, the thumb pain, or

both. On September 6, 2001, Unum reversed course and terminated Moon's benefits as of August 27, 2001. In a letter to Moon, Unum asserted that according to its reviewing physician, "there is no medical data to support restrictions and limitations preventing you from returning to work in your own occupation." J.A. 27. In reaching this conclusion, Unum relied on its own review of Moon's medical records, including reviews performed by a clinical consultant and by physicians employed by Unum.

Specifically, Unum's in-house reviewing physician, Dr. Steven Feagin, reported that "[t]here is nothing presented to objectively support impairment that would produce limitations or necessitate restrictions from [light work] activities." J.A. 7. Feagin cited an August 10, 2000, "exercise study" in which Moon demonstrated what Feagin described as "poor exercise tolerance for [her] age." *Id.* Nevertheless, Feagin concluded that Moon's performance "still equates to sustained light work on a full-time basis." *Id.* Feagin further noted that according to Moon's cardiologist, Dr. Janos Gellert, Moon did not have a cardiac problem. J.A. 19. However, in a June 17, 2000 letter to Watson, Gellert specifically lists as a risk factor the fact that Moon "has hypertension which is not easy to control." J.A. 18. Regarding Moon's thumb pain, Feagin concluded that there was no objective basis to view Moon as unable to work with accommodations.

After her LTD benefits were terminated, a Michigan Worker's Compensation hearing officer granted Moon worker's compensation benefits, finding that Moon's bilateral thumb pain rendered her unable to do the file-lifting and writing that was a necessary component of her job in the Borgess admitting department.

In October 2001, Moon filed an administrative appeal of Unum's termination of her LTD benefits. In the appeal letter, Dr. Watson urged Unum to reconsider, concluding: "Mrs. Moon is essentially disabled, and because of her ongoing medical problems, is absolutely not able to return to work. Despite multiple cardiac, radiological, and other evaluations, a source for her extremely labile and symptomatic hypertension has not been determined. Medication is only moderately effective in controlling this and, in essence, she is not able to hold down a full time job. In fact, she is unable to do most of her daily activities around the house because of the hypertension causing chest pain and shortness-of-breath." J.A. 36. To this letter, Watson attached medical records from cardiologist Dr. Robert LaPenna, who had examined Moon in September 2001, and from Watson herself, who had examined Moon in March and June 2001. Watson's records establish that Moon's severe hypertension did not show a likelihood of abating. In addition, Watson's patient chart notes reflect that Moon suffered bouts of depression, for which Watson prescribed anti-depressants, and sharp fluctuations in blood pressure. Lapenna's records establish that Moon had "typical exertional angina," but her coronary arteries were functioning normally; Lapenna recommended that cardiac rehabilitation proceed. Lapenna, however, did not suggest that Moon was able to work.

As it had with respect to Moon's initial claim, Unum assigned Feagin the task of reviewing Moon's appeal submissions. On November 7, 2001, Feagin reported that his "prior impressions are unchanged and reinforced by appeal submissions." J.A. 40. Feagin reasoned that Moon's records disclosed no "objective evidence of cardial pulmonary or hypertensive impairment producing limitations or necessitating restrictions that would preclude regular sustained full-time sedentary or light work endeavors." *Id.* On the basis of Feagin's review and report, Unum denied Moon's appeal on November 12, 2001. Beginning on February 18, 2002 and continuing through May 2002, Moon, through counsel, submitted new medical evidence to Unum, including evidence adduced at Moon's Worker's Compensation hearing and at a Social Security benefits hearing; Moon prevailed on her Social Security claim and began receiving disability benefits from the Social Security Administration in May 2002. Dr. Feagin again was charged with reviewing Moon's case. And again Feagin concluded that Moon had failed to present any objective evidence to support her claim that she was unable to work. Specifically, Feagin observed: "It is of note that the deposition of Dr.

Watson reveals rather unorthodox opinions with respect to the impact of hypertension on work capacity." J.A. 198.

The "deposition" to which Feagin referred was testimony Watson gave at Moon's Social Security hearing. Watson testified there that she was Moon's primary treating physician and had treated Moon for severe hypertension. Watson explained that with respect to Moon's bilateral thumb pain, she would defer to Dr. James Smith, who was the specialist treating Moon for that condition. Watson testified that Moon suffered from "labile hypertension," which she described as blood pressure that "goes up and down . . . [i]t fluctuates and is mostly uncontrolled." J.A. 186. In Watson's view, the labile hypertension had a significant impact on Moon's ability to work on an ongoing basis. Specifically, Watson explained: "[Moon's labile hypertension] is unable to be controlled. We can find no other underlying etiology causing it that we can treat. She's on multiple medications, but, yet, she still has fluctuations of very high blood pressure that cause severe headaches, even chest pains. She's really not able to function being up on her feet like going to the grocery store for any prolonged length of time because of this blood pressure problem." J.A. 184-85. Watson determined that Moon should sit or stand for "not more than one or two hours out of an eight-hour day." J.A. 182. Watson reached this conclusion on the basis of routine blood pressure checks performed between 1999 and 2001 by Watson and other doctors, *see* J.A. 169, 181-82, which demonstrated "dangerously elevated" blood pressure levels. J.A. 180.

Due to these dangerously high blood pressure levels, Watson insisted that Moon spend most of her time reclined. Watson repeatedly asserted that Watson could not work. When asked: "Is there any way in your mind that a person could work with this blood pressure," Watson responded: "No." J.A. 180. Watson further explained that the level of stress at Moon's job was essentially irrelevant because Moon's blood pressure fluctuated dramatically wherever she happened to be. Finally, Watson laid out her reasoning under questioning:

QUESTION:  Let's suppose that her hands were no problem, that the stuff that Dr. Smith's been treating her for wasn't any issue. Would you or would you not think that solely on the basis of her blood pressure, she was disabled from regular, full-time employment no matter how light, no matter how simple?

ANSWER:  Yes.

Q:  You would?

A:  I would.

Q:  Just to give you some examples, one of the jobs that Social Security uses is what's called a security monitor. You watch closed circuit TVs and, if you see something on the TV like an intruder or something, you call the authorities. You've got to be there six or eight hours, but, literally, all you're doing is watching TV. Do you think she could do that?

A:  No, I don't.

Q:  Why not?

A:  Again, just a sitting position for her can make her blood pressures rise to the point where she has significant side effects, and, I don't believe that she could sit for a six-hour period.

Q:          Even with standard breaks and a lunch and that sort of thing?

A:          Even with those, I don't believe so.

Q:          Okay. And, your opinion then is that this has been the case since, I think you said, December of 1999, is that right?

A:          Yes.

. . .

Q:          . . . Is there anything else that you can think of that would help a judge understand the nature of this problem and why it's disabling that we haven't covered?

A:          In her case, we don't know why she has this. We have tried every means possible to get it under control, and, although the medication that we have can help alleviate some of those side effects, in and of itself, the medication can cause side effects such as sedation, confusion, so, no matter what we do with her, even if we treat what we can treat, which is not completely effective, she gets side effects from what we use to treat her as well.

. . .

Q:          Okay. Anything else you can think of to add, Doctor?

A:          I think this lady really would like to work if she could. She really does have a strong work ethic, and, she wants to provide for her son. She just simply is not physically able no matter what she has tried, and, she's been willing to undergo any tests we have asked her to undergo, and, we simply can't determine a cause for her problem.

J.A. 176-79. The Social Security administrative law judge ("ALJ") found that Moon's "allegation of intractable and debilitating labile hypertension with chest pain is credible." J.A. 168. Further the ALJ concluded: "[Moon]'s impairment prevents her from sitting, standing, or walking for prolonged periods or concentrating upon tasks . . . . [Moon] is unable to perform her past relevant work." *Id.*

Despite Watson's detailed testimony and the ALJ's findings, Feagin concluded that Moon's second appeal submissions presented no new objective information. Feagin rejected Watson's conclusion that Moon was unable to perform light sedentary work. Specifically, Feagin found no reason to conclude that Moon could not stand or sit because, in contrast to Watson's "formulation" that Moon's blood pressure typically increased when she was sitting or standing, "one typically sees higher pressures in the supine position." J.A. 198. Feagin relied upon an examination of Moon performed by Dr. Mark O'Brien at the request of Borgess, the defendant in Moon's worker's compensation proceeding. Feagin points out that a blood pressure measurement taken by O'Brien in the May 31, 2001 examination reflects a higher blood pressure level in the supine position than in the sitting position. Thus, Feagin concluded that the Social Security ALJ "was therefore flawed in his acceptance of the unsupported contention that the hypertension prevented prolonged sitting, standing, or walking." J.A. 198-99. Feagin was similarly unswayed with regard to Moon's bilateral thumb pain. Feagin's report for Unum did not mention that in the discussion section of his May 31, 2001 report, O'Brien stated: "Diane has chronic severe hypertension, which has been refractory to multiple medications. Please note: hypertension means high blood pressure and should not be equated with emotional anxiety or tension. She is apparently intolerant of calcium channel blockers,

which cause flushing. Her blood pressure control is not optimal . . . . The blood pressure currently is not well controlled almost one year following her last day of work which implies her occupation is not causing the hypertension." J.A. 114.

Based on Feagin's determinations, Unum upheld its termination of Moon's LTD benefits by letter dated July 11, 2002. Just over two months later, on September 18, 2002, Moon filed a complaint in the Western District of Michigan under ERISA, 29 U.S.C. § 1001 *et seq*. Moon moved for judgment on the administrative record. After hearing arguments on April 15, 2003, the district court denied the motion and affirmed Unum's final decision upholding the termination of Moon's LTD benefits. Moon then filed this appeal.

## II. STANDARD OF REVIEW

In an ERISA benefits case, we review *de novo* a district court's decision to deny a motion for judgment on the administrative record. *E.g.*, *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 361 (6th Cir. 2002). The general rule is to review a plan administrator's denial of ERISA benefits *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, where, as is the case here, a plan vests the administrator with complete discretion in making eligibility determinations, such determinations will stand unless they are arbitrary or capricious. *Id*. Our review is confined to the administrative record as it existed on July 11, 2002, when Unum issued its final decision upholding the termination of Moon's LTD benefits. *E.g.*, *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 615 (6th Cir. 1998) (holding that the district court and the court of appeals are limited to reviewing the administrative record as it existed when the plan administrator made its final decision). If the administrative record so limited can support a "reasoned explanation" for Unum's decision, the decision is not arbitrary or capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).

Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." *McDonald*, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id*. In performing that task with respect to Moon's case, we conclude that the record cannot support a "reasoned explanation" for Unum's decision. *See Williams*, 227 F.3d at 712.

## III. DISCUSSION

Moon's primary claim for LTD benefits is based on severe labile hypertension. Dr. Watson cited bilateral thumb pain as a secondary debilitation and the parties make passing reference to the thumb pain issue in their briefs, but it is clear that our focus must be on Moon's hypertension. In any event, as we explain below, Unum offered a reasoned explanation for terminating Moon's benefits to the extent they related to her thumb pain. However, Unum distinctly failed to do so regarding Moon's hypertension. We now review the various medical evidence and opinions available to Unum at the time it decided to uphold the termination of Moon's LTD benefits. Our review of the administrative record in its entirety compels the conclusion that Unum's final decision was arbitrary and capricious.

A.       **Bilateral Thumb Pain**

Initially, we address Moon's claim to the extent it relates to her thumb condition. We have very little to go on because the parties' briefs discuss this issue only in a cursory fashion. The administrative record presented Unum with various evidence relating to Moon's bilateral thumb pain but no definitive medical opinion regarding Moon's ability to work. As our discussion below indicates, this is in contrast to the record regarding hypertension. Dr. Watson's original physician's statement from the September 2001 claim indicated that Moon's thumb pain severely limited her activity. In addition, the record contained two depositions of Moon's hand surgeon, Dr. James Smith. Smith was deposed in May 1999 and February 2001 pursuant to Moon's worker's compensation claim against Borgess. In the February 2001 deposition, Smith asserted that it would be difficult for Moon to work but admitted in cross examination that in his various examinations of Moon during 1999 and 2000, he permitted her to return to work and did not recommend specific restrictions that would conflict with her ability to perform her duties. Moreover, the record shows that Moon was last examined by Smith on May 25, 2000; subsequent to that examination, Moon returned to work at Borgess. The record further shows that the precipitating cause of Moon's medical leave, which commenced on June 16, 2000, was her labile hypertension. In sum, the administrative record does not suggest that Moon would have been unable to work solely on account of her thumb pain even if her doctors were able to ameliorate her hypertension.[1] As it was, however, her doctors were not able suppress the hypertension; it is to a discussion of this issue that we now turn.

B.       **Severe Labile Hypertension**

Regarding Moon's hypertension, the medical evidence and opinions available to Unum were as follows. First, Unum had before it various records relating to Moon's admission to Borgess in June 2000 for hypertension. Records compiled at that time by Dr. Reagan show that doctors at Borgess, including Reagan and Lapenna, had diagnosed Moon with atypical chest pain, chronic stage III hypertension, hypertensive emergency and a history of serious hypertension. The terms of Moon's discharge, Reagan's records show, were that she receive home care and prompt follow-ups from Dr. Watson. In addition, the discharge records from Borgess include a June 17, 2000 memo from cardiologist Dr. Janos Gellert who found that Moon did not have a heart problem at that time but noted that her uncontrollable hypertension was a risk factor. Second, the administrative record included Dr. Watson's September 2000 physician's statement, filed as part of Moon's original claim for LTD benefits, in which Watson explained that Moon could not engage in activities for more than one or two hours without frequent resting and could not lift more than 10 pounds or engage in any strenuous activity.

Third, the record contained Moon's October 2001 appeal submissions, which included a letter from Watson to the effect that Moon was "absolutely not able to return to work," and, indeed, could not perform daily activities due to her uncontrollable hypertension. Further records from

---

[1] Unum's decision with regard to the thumb pain was not arbitrary and capricious merely because it was at odds with the findings of a Michigan Worker's Compensation officer who, in September 2001, granted Moon's claim for worker's compensation benefits. The hearing officer expressly noted that two doctors who had examined Moon, Drs. Smith and Wessinger, arrived at different conclusions regarding her ability to work in Borgess's admissions department in a light sedentary capacity. The hearing officer elected to credit Dr. Smith to the extent he disagreed with Dr. Wessinger, who would have permitted Moon to work. J.A. 141. As we have previously held, where there are two reasoned medical opinions on an issue, it is not arbitrary and capricious to select one over the other. *See Mcdonald*, 347 F.3d at 169. In addition, the hearing officer credited Dr. Smith even in light of his admissions on cross examination that he had not examined Moon since May 25, 2000. Unum observed when it terminated Moon's benefits, and again when it upheld the termination, that the only medical opinions offered by Moon with regard to her thumb pain were based on examinations performed at a time when she was still working and by doctors who did not recommend that Moon stop working.

Watson and records from Lapenna accompanied Watson's letter, with Watson's records showing that Moon's hypertension continued to endure despite attempts at treatment, and Lapenna's records showing that despite the absence of coronary problems, Moon retained "typical exertional angina." Significantly, Lapenna was not asked, nor spoke to, whether Moon was able to work. Fourth, the administrative record included the report of Dr. O'Brien, who examined Moon in May 2001 on behalf of Borgess in relation to Moon's worker's compensation claim. O'Brien's single blood pressure measurement reflects that Moon's blood pressure was higher in the supine position than in the sitting position. Yet O'Brien did not comment on this; instead, he noted that Moon has "chronic severe hypertension, which has been refractory to multiple medications." J.A. 114. Notable is the fact that O'Brien did not speak to whether Moon was able to work. Finally, Unum had Watson's April 2002 Social Security testimony to consult. As recounted in detail above, Watson carefully explained in that testimony how Moon's uncontrollable labile hypertension rendered her unable to work.

As discussed above, Unum committed the analysis of this record to Dr. Feagin each time it was further developed with new submissions. Each time, Dr. Feagin rejected Watson's medical opinion. Feagin's own report indicates that the primary basis for rejecting Watson's view was the blood pressure measurement performed on Moon by Dr. O'Brien in May 2001. Indeed, it is on the strength of this one measurement that Feagin described Watson's view that Moon was unable to work as "unsupported." This does not constitute a reasoned explanation for the termination of benefits in light of the administrative record available to Feagin. As we have discussed, O'Brien himself declined to make a prediction regarding Moon's ability to work and did not even refer to the blood pressure measurement in his discussion of Moon's condition. Instead, O'Brien's analysis indicates the severity of Moon's hypertension and its apparent immunity to various medicines. In addition to the fact that O'Brien's overall analysis is consistent with Watson's analysis, we note that he examined Moon only once. By contrast, Watson is Moon's primary treating physician. And as we have recounted, Watson has consistently offered detailed explanations for her conclusion that Moon is unable to work.[2]

According to Unum's own documents, the only medical opinion contrary to Watson's was Dr. Feagin's. He arrived at his opinion not upon examination of Moon, but rather upon what our discussion here shows was a selective review of the administrative record. *See Spangler*, 356 F.3d at 359-62 (observing that a selective review of the administrative record is inappropriate). Furthermore, Dr. Feagin's role was not as a neutral independent reviewer, but as an employee of Unum. It is not enough for Unum to offer an explanation for the termination of benefits; the explanation must be consistent with the "quantity and quality of the medical evidence" that is available on the record. *McDonald*, 347 F.3d at 172. It must be a "reasoned explanation" that supports the outcome reached by the administrator. *See id.*; *see also Williams*, 227 F.3d at 706. We determine whether an explanation is reasoned solely by reference to the administrative record; we ask whether, in light of the administrative record as a whole, the explanation for the decision to deny or terminate benefits is rational. Furthermore, when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism. *See Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000) (holding that a plan administrator's conflict of interest is a factor to consider when reviewing for whether the administrator's decision was arbitrary or capricious). With these principles in mind, we cannot

---

[2]We do not hold that Unum was required to defer to Watson's judgment. The Supreme Court has made clear that mandatory deference to treating physicians, while appropriate in the Social Security context, is not appropriate in the context of ERISA benefits determinations. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829-833 (2003). However, *Black & Decker* does not alter the typical arbitrary-and-capricious standard of review. We still must ask whether, viewing the administrative record as a whole, Unum has offered a reasoned explanation for its final decision. Dr. Watson's letters and notes as well as her testimony, presented in the context of a Social Security hearing, are all part of the administrative record in this case.

conclude that Feagin's explanation for rejecting Watson's recommendation for her own patient was "reasoned." As we have discussed, there was a wealth of medical evidence available to Feagin. Rather than contend with the reality that all of the doctors who examined Moon agreed she had chronic and severe hypertension which was not susceptible to successful treatment, Feagin seized upon a single blood pressure measurement performed by a doctor who himself cautioned that Moon's hypertension appeared to be intractable. Unum does not present us with the opinion of any doctor, except Feagin's, to the effect that Moon's hypertension was not a barrier to returning to work. *Cf. McDonald*, 347 F.3d at 169 (observing that a plan administrator's decision to rely on the medical opinion of one examining doctor over another is ordinarily not arbitrary and capricious). Indeed, the only independent medical opinion in the administrative record regarding Moon's ability to work was that of Dr. Watson. Viewing the administrative record in its entirety, Unum has not offered a reasoned explanation to support its conclusion that Watson's analysis is flawed and that Moon is able to work.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Unum's final decision upholding the termination of Moon's LTD benefits was arbitrary and capricious. The district court, therefore, erred in denying Moon's motion for judgment on the administrative record. Accordingly, we REVERSE and REMAND for entry of judgment in favor of Moon.

———————

**DISSENT**

———————

SILER, Circuit Judge, dissenting.  I respectfully dissent because I think under the highly deferential arbitrary and capricious standard, the district court did not err in upholding the denial of benefits.

Certainly, as the majority observes, Dr. Feagin was on Unum's payroll, so that fact must be considered.  Nevertheless, he is a qualified board-certified internist physician who concluded that Dr. Watson's opinions were "rather unorthodox" because Dr. Watson opined that Moon would have higher blood pressure in the sitting position than in the supine position.  Dr. Feagin also decided that Moon could work based upon Dr. O'Brien's blood pressure tests revealing that Moon's pressure was higher in the supine position and Dr. O'Brien's observation that "with proper and effective antihypertensive medication, I suspect her blood pressure is indeed controllable and should not alone be considered disabling."  Dr. Feagin further found that Moon had no "evidence of significant hypertensive end organ damage."  He admitted Moon could not perform medium to heavy work, but he concluded she could do sedentary or light work.

As *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829-33 (2003), holds that the opinion of the treating physician is not to be given deference over that of other physicians, I would find that the decision not to award long-term benefits by Unum was not arbitrary and capricious, because it was based on Dr. Feagin's conclusions.  Were we to view the matter under a *de novo* standard, I might very well decide otherwise.