RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOEL HELFMAN,

               *Plaintiff-Appellant,*

       *v.*

GE GROUP LIFE ASSURANCE COMPANY;
GENWORTH LIFE AND HEALTH INSURANCE
COMPANY; and SUN LIFE ASSURANCE
COMPANY OF CANADA,

               *Defendants-Appellees.*

No. 08-2168

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-13528—Victoria A. Roberts, District Judge.

Argued: June 18, 2009

Decided and Filed: July 24, 2009

Before: MOORE and GILMAN, Circuit Judges; PHILLIPS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** J. Laevin Weiner, FRANK, HARON, WEINER AND NAVARRO, Troy, Michigan, for Appellant. James E. Brenner, CLARK HILL PLC, Detroit, Michigan, Kimberly J. Ruppel, DICKINSON WRIGHT, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** J. Laevin Weiner, FRANK, HARON, WEINER AND NAVARRO, Troy, Michigan, for Appellant. James E. Brenner, CLARK HILL PLC, Detroit, Michigan, Kimberly J. Ruppel, DICKINSON WRIGHT, Bloomfield Hills, Michigan, for Appellees.

_____

## OPINION

_____

    THOMAS W. PHILLIPS, District Judge. This is a dispute regarding the termination of plaintiff-appellant Joel Helfman's long-term disability ("LTD") benefits.

-----

    [*]The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting by designation.

After suffering various cardiac episodes in late 2003, Helfman began receiving disability benefits from defendant-appellees Genworth Life and Health Insurance Company, formerly known as GE Group Life Assurance Company ("Genworth"), and Sun Life Assurance Company of Canada ("Sun Life"). Genworth and Sun Life terminated payment of LTD benefits to Helfman in March 2005 and May 2005, respectively. The district court below found that the Employee Retirement Income Security Act ("ERISA") governed plaintiff's plan, as plaintiff had not satisfied the first of four required criteria for the so-called "safe harbor" exemption from ERISA to apply. Applying applicable ERISA standards, the district court upheld defendants' termination of plaintiff's disability benefits as not arbitrary or capricious. Helfman appeals the finding that his LTD benefits plans are governed by ERISA and the finding that Sun Life's termination of benefits was not arbitrary or capricious.

For the reasons that follow, we **AFFIRM** the district court's finding that ERISA governs plaintiff's LTD plans, but **REVERSE** the district court's finding that Sun Life's termination was not arbitrary or capricious and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff/appellant Joel Helfman is a sixty-six-year-old male previously employed by two construction businesses owned by his family, Atlas Filmore Lumber Company ("Atlas Filmore") and Fairway Construction Company ("Fairway"). Helfman owns 50% of Atlas Filmore. The two businesses, though separate entities for tax-reporting and Michigan-corporate-entity-identification purposes, are apparently very closely related, sharing the same address, phone number, and Data Universal Numbering System number for government contract work.

Although Helfman worked for both companies, he was officially employed by Atlas Filmore. His official job title appeared to be Secretary-Treasurer, as his employer listed his occupation in Helfman's claim for short-term disability benefits. Helfman, however, listed his occupation simply as Executive. His employer stated that his job

duties entailed "supervis[ing] meetings, estimating, reviewing bids, new products." Helfman was responsible for supervising ten employees.

In June 2002, Fairway began coverage for its employees under a Group Long-Term Disability Insurance Policy issued by Genworth. In June 2003, Atlas Filmore began coverage for its employees under a Group Long-Term Disability Insurance Policy issued by Sun Life. Atlas Filmore paid premiums for Helfman to both Genworth and Sun Life. Helfman alleges he then reimbursed Atlas Filmore the full cost of his premiums, although Sun Life and Genworth dispute the evidentiary support for this assertion. Helfman concedes that it is a factual issue left unresolved by the district court.

On December 23, 2003, Helfman visited his doctor, concerned by burning discomfort in his chest. Helfman had previously suffered a heart attack in 1992, subsequent to which he had undergone a balloon angioplasty of his right coronary artery, later undergoing the same procedure on his left anterior descending artery. Helfman is also a long-time smoker and suffers from morbid obesity, hypertension, and diabetes, among other conditions. A heart catheterization subsequent to his December 23 visit revealed severe coronary artery disease. Accordingly, on December 26, 2003, Helfman underwent quadruple bypass surgery. He spent the following months at his condominium in Florida, enrolled in a cardiac rehabilitation program and recuperating in general.

In early January 2004, Helfman applied for and received short-term disability benefits from both Genworth and Sun Life. After the appropriate time period, both started paying LTD benefits. During the first twenty-four months of LTD benefit payment, Sun Life's policy terms required Helfman to demonstrate that he was unable "because of Injury or Sickness ... to perform the Material and Substantial Duties of his Own Occupation."

Helfman continued extensive treatment in 2004, undergoing a repeat catheterization in June 2004, after which his primary treating physician, Alan J. Silverman, M.D., elected to treat him medically as opposed to surgically due to his condition. In October 2004, Dr. Silverman's notes state that Helfman denied chest pain

and was exercising on a treadmill without difficulty and without symptoms. In February 2005, Dr. Silverman approved Helfman for gastric bypass surgery to treat his morbid obesity. Throughout Helfman's treatment history, however, Dr. Silverman opined that Helfman could not return to work due to stress and the potential for it to exacerbate his condition.

In January 2005, while processing Helfman's benefits claim, Sun Life learned that Genworth was also paying Helfman benefits. Sun Life notified Genworth, the latter entity which then investigated and discovered that Genworth paid Helfman benefits because of his Fairway insurance, Sun Life because of his Atlas Filmore insurance.

Genworth terminated benefits on March 30, 2005, finding that Helfman was no longer eligible because his benefits from Sun Life qualified as "other income" as that term is defined under Genworth's policy. Sun Life terminated benefits on May 2, 2005, after a file review by Loretta Dionne, R.N., led it to determine that Helfman was no longer disabled as defined by the policy. For purposes of LTD benefits, under Sun Life's policy an individual is totally disabled if "during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." In a letter to Helfman, Sun Life found that Dr. Silverman had noted improvements in Helfman's condition, specifically that in October 2004 he was exercising without difficulty and that he denied chest pain, and that his condition was sufficiently stable for gastric bypass surgery. Sun Life further concluded that Helfman's subjective complaints of stress did not support an objective finding that he could not perform the material and substantial duties of his previous occupation.

In response, Dr. Silverman wrote a letter to Sun Life, again insisting that Helfman was unable to work due to stress and explaining the course of treatment. In pertinent part, Dr. Silverman opined that Helfman remained in a high-risk group for further cardiac events; treatment notes such as his approval for Helfman's gastric bypass surgery were unrelated to whether he could perform the duties of his occupation. Dr. Silverman specifically opined that the stress of surgery was unrelated to the ongoing

stress of Helfman's occupation.   On administrative appeal to Sun Life, Sun Life submitted Helfman's file for review to Dr. W. Wallace Watson, M.D.; Robert Violetta, M.S., Sun Life's Rehabilitation Consultant; and Paul W. Sweeney, M.D., a cardiologist. On January 10, 2006, Sun Life informed Helfman that it was upholding the denial of benefits.

Having exhausted his administrative appeals before each entity, on June 14, 2006, Helfman filed suit in the Oakland County Circuit Court for the State of Michigan. Defendant Sun Life removed the case to the Eastern District of Michigan, citing both federal question jurisdiction under ERISA and diversity jurisdiction as grounds for removal.   Genworth consented to the removal.   Although Helfman disputes that ERISA applies to his case, he concedes that removal was nevertheless proper on diversity grounds.

In an Opinion and Order dated August 8, 2008, the district court found that ERISA applied to Helfman's program, due to ERISA's policy goal of promoting a uniform regulatory scheme.   Finding that the interpretation sought by Helfman would thwart this goal, the court found the safe harbor exemption from ERISA did not apply. Accordingly, the district court applied ERISA standards of review to Helfman's claim and found that neither defendant's decision to terminate benefits was arbitrary or capricious.[1]

Helfman timely appealed, reiterating his argument that ERISA does not govern and that state law applies to his claim.   Should we find that ERISA applies, Helfman appeals solely the finding that the denial of benefits by Sun Life was not arbitrary or capricious.

---

[1]The district court's opinion was devoid of explanation of these findings.  With regard to Sun Life, the district court simply stated, "The Court upholds Sun Life's termination of benefits, based on Helfman's lack of a continuing disability.  Sun Life 'acted rational[ly] in light of the Plan's provisions.'" Op. and Order, Oct. 8. 2008, at 11 (quoting *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000) (quotation marks omitted)).

## II.  ANALYSIS

### A.      Applicability of ERISA

Helfman argues that the administration of his disability benefits is not governed by ERISA but rather is governed by state law.  Specifically, Helfman argues that he is subject to the "safe harbor" exception to ERISA applicability.

The so-called "safe harbor" exempts from ERISA coverage "[c]ertain group or group-type insurance programs."  29 C.F.R. § 2510.3-1(j).  State law governs plans falling within the safe harbor.  For the safe harbor to apply, all four of the following criteria must be met:

> (1)     No contributions are made by an employer or employee organization;
>
> (2)     Participation [in] the program is completely voluntary for employees or members;
>
> (3)     The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4)     The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

*Id.* § 2510.3-1(j)(1) to -(4); *see also Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 435 (6th Cir. 1996) ("A policy will be exempted under ERISA only if all four of the 'safe harbor' criteria are satisfied.").

Whether the safe harbor applies in the instant case is a function of the first criterion.  Helfman argues that since he reimbursed both companies for his premiums, he has satisfied the first criterion, despite the fact that the companies contributed to premiums on behalf of other employees under the same group plan.  Helfman argues, however, that a "hybrid" approach is appropriate under the safe harbor:  because he, as

an individual, meets the four criteria of the safe harbor, the governance of his LTD plan is exempt from ERISA and subject to state law, whereas the remaining employees participating in the group plan on whose behalf the company contributes to premiums remain subject to ERISA.

The district court assumed for purposes of argument that Helfman had fully reimbursed his employer the full amount of his premiums. Accordingly, the court below addressed the following discrete question of law: under the first criterion of the safe harbor, may various employees who participate in the same plan be subject to differing governing schemes, according to whether they pay their own premiums in full or whether the employer contributes to their premiums in part or in whole? The district court answered in the negative, finding that allowing a single plan to be at once subject to state and federal law, depending on the employee, would frustrate the purposes of ERISA.

Having found that application of the safe harbor was precluded because the first criterion could not, as a matter of law, be satisfied, the district court did not consider the remaining three criteria. Although both appellees argue these three criteria on appeal, because determining whether the remaining three criteria have been met requires findings of fact not developed by the district court, our analysis likewise focuses solely on the first criterion.

With regard to the first criterion, because the district court assumed the truth of the factual issues presented and determined solely the legal issue of whether the same benefits plan may be governed by varying regulatory schemes with respect to any given employee, we review this legal issue de novo, likewise assuming that Helfman fully reimbursed his employers his premiums. *See Waxman v. Luna*, 881 F.2d 237, 240 (6th Cir. 1989) ("[W]henever the trial court arrives at its conclusion by application of statutory law to the facts, such holding becomes a conclusion of law reviewable under the *de novo* standard. In the case before us, the district court has applied ERISA statutory law to the facts of the case, and, therefore, we will undertake a *de novo* review of the district court's conclusions of law." (internal citation omitted)); *see also, e.g.*,

*Santino v. Provident Life & Accident Ins. Co.*, 276 F.3d 772, 774 (6th Cir. 2001) ("The district court's ruling that ERISA preempts Santino's state law claims is a legal conclusion, which this Court reviews *de novo*.").

We begin our analysis by considering the policy objectives underlying ERISA preemption of state law, as these objectives are particularly instructive with respect to this issue. ERISA explicitly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "The purpose of ERISA preemption was to avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005); *accord, e.g.*, *Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 361 (6th Cir. 2000) ("The [Supreme] Court found that the 'basic thrust' of the clause was 'to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans ....'") (quoting *N.Y. State Conference of Blue Cross & Blue Shields Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657 (1995))).

Indeed, the Supreme Court has previously expressed its disapproval of the very result that Helfman seeks because it would thwart these policy objectives. In *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004), the Court considered the issue of whether an owner-employee could be a "participant" as defined by ERISA and therefore subject thereto. The Court found in the affirmative and, citing the aforementioned policy objectives, noted, "Recognizing the working owner as an ERISA-sheltered plan participant also avoids the anomaly that the same plan will be controlled by discrete regimes: federal-law governance for the nonowner employees; state-law governance for the working owner." *Id.* at 17.

The policy objectives underlying ERISA and the Supreme Court's dicta in *Yates* heavily inform our analysis. Drawing therefrom, it is clear that the selective application of ERISA that Helfman seeks would frustrate the purposes underlying preemption and lead to the anomaly criticized in *Yates*. Although Helfman argues that allowing a so-called "hybrid" approach would lead to "no real detriment," we disagree. The problems

such disparate governance could create could indeed be myriad. For example, a nationwide corporation could potentially have thousands or even hundreds of thousands of employees under the same plan, for some of whom the plan is governed by the law of their particular state and for others of whom the plan is governed by ERISA. The nationwide plan precisely illustrates the problem that Helfman's narrow focus has failed to recognize but that Congress foresaw: because our nation comprises fifty states, state regulation of plans creates the potential for fifty (or indeed more) conflicting governance structures. Uniform governance under federal law avoids these conflicts.

Nevertheless, Helfman attempts to overcome the application of the above policy considerations in general and the *Yates* case in particular by arguing that the "circumstances and equities are not on all fours" with the instant case. Although Helfman is correct that the holding in *Yates* does not govern the precise issue we face, the practical effect identified and avoided by the Court in reaching that holding is the same: namely, to apply the safe harbor as requested by Helfman would lead to "the anomaly that the same plan will be controlled by discrete regimes." *Yates*, 541 U.S. at 17. To that end, we find that the ERISA policy of uniform regulation dictates a finding that a single plan may not be variously governed by both ERISA and state law, depending on the particular employee in question.

We likewise disagree with Helfman's attempt to analogize the instant case to our ruling in *Thompson v. American Home Assurance Co.*, 95 F.3d 429 (6th Cir. 1996). In that case, we determined the applicability of the safe harbor, in particular whether an employer had endorsed an employee welfare benefit plan under the third criterion so as to preclude the application of the safe harbor. We found that the proper framework for analyzing the third criterion was from the employees' point of view. *Id.* at 436-37. Helfman contends that *Thompson* informs the proper viewpoint for analyzing the first criterion. Because his expectations are to be exempt from ERISA and subject to state law, he argues, that expectation should control, irrespective of which scheme governs the disbursement of benefits to his fellow employees under the same plan.

But Helfman oversimplifies the issue. Reducing the analysis to a mere determination of which regulatory scheme the employee wishes to be subject to would lead to the very lack of uniformity that ERISA preemption was intended to prevent. Moreover, applying an employee-based vantage point to the third criterion is appropriate because it holds an employer responsible for its representations, and importantly such a framework does not lead to differing legal regimes governing the same program. But such a framework serves no such purpose with regard to the first criterion and indeed would lead to the anomaly we seek to avoid.

We also disagree with Helfman's contention that this so-called "hybrid" approach is not only permitted under the first criterion but indeed would be desirable, as it would best achieve the goal of ERISA of "protect[ing] ... the interests of participants in employee benefit plans." 29 U.S.C. § 1001(b). Contrary to Helfman's assertion, we recently found ERISA's extensive preemption provisions were actually intended to advance the protection of participants' interests under § 1001(b) by "ensur[ing] that employee benefit plan regulation would be exclusively a federal concern." *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)). Accordingly Helfman's interest in choosing a state-law-governed plan is not the sort of "interest" that § 1001(b) protects, and indeed those interests protected by § 1001(b) are best served by uniform governance under federal law.

Accordingly, we hold that if an employer contributes to any employee's payment of premiums, ERISA must apply to the entirety of the particular insurance program, regardless of whether one or more employees pays his own premiums in full.[2] Because

---

[2] On June 22, 2009, Genworth submitted additional case citations to the circuit clerk pursuant to Rule 28(j). Although we agree with the result advocated by appellees Genworth and Sun Life, we do not find that the additional case citations submitted by Genworth support this conclusion. In the first case cited, while the district court found that the first criterion had not been satisfied, as Helfman notes, the court denied summary judgment on the grounds that a genuine issue of material fact remained as to who paid the premiums. *Roberts v. Principal Life Ins.*, No. 07-11936, 2009 WL 691872 (E.D. Mich. Mar. 12, 2009). The case in no way pertains to the discrete question of law we face, as it did not pertain to the issue of whether a "hybrid" plan can satisfy the first criterion. In the second case, we held that a plan failed to meet the criteria of the safe harbor, in part because the employer at issue permitted some employees to reimburse him for premiums and paid premiums in full for at least one employee. *Fugarino v. Harford Life & Accident Ins. Co.*, 969 F.2d 178, 184 (6th Cir. 1992). While this certainly is in the same vein as the instant case, today we find explicitly as a matter of law that where an employer who pays premiums on

Helfman's employer contributed to premiums on behalf of the majority of the employees, the first criterion of the safe harbor exception cannot be met, and the judgment of the district court in that respect is affirmed.

**B.    Whether Sun Life's Termination of LTD Was Arbitrary and Capricious**

Because the plan at issue is subject to ERISA, ERISA standards of review apply. "We review *de novo* the decision of a district court granting judgment in an ERISA disability action based on an administrative record. If, as here, the insurance plan administrator is vested with discretion to interpret the plan, [3] we review the denial of benefits under the arbitrary and capricious standard." *DeLisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009) (quotation and internal citation omitted); *accord, e.g.*, *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) ("[W]here, as here, the plan administrator is given the discretionary authority to determine the elligibility for benefits or to construe the plan terms, we review the administrator's decision to deny benefits using the highly deferential arbitrary and capricious standard of review." (quotation marks omitted)). "Under this standard, we uphold the administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008) (quoting *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd*, 128 S. Ct. 2343 (2008)). The administrator's decision must be "rational in light of the plan's provisions." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)).

---

behalf of any employee, even though others reimburse him for the payments, such a group plan cannot satisfy the first criterion of the safe harbor under 29 C.F.R § 2510.3(j). Moreover, *Fugarino* suggests that our conclusion there rested in part on a finding that the employer had endorsed the plan. *See Fugarino*, 969 F.2d at 184 ("Fugarino has done far more than purchase a group health insurance policy and advise his employees of its availability.").

[3]The plan grants Sun Life full discretionary authority "to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy," including, but not limited to, "the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this policy."

Helfman argues that even if we find ERISA to be applicable, the denial of benefits by Sun Life should be reversed as arbitrary and capricious. Helfman raises the following issues on appeal:

> Sun Life failed to give proper consideration to the demands of his employment; failed to consider the stress attributable to his work circumstance; did not investigate his work circumstance; did not consult with his long-standing treating physician; did not conduct an independent medical exam; and[] did not cause a face[-]to[-]face meeting with and evaluation of Helfman.

Helfman further argues that the district court failed to take into account Sun Life's conflict of interest as both the arbiter and payor of benefits.

### 1.     *Conflict of Interest*

"[A] conflict of interest exists for ERISA purposes where the plan administrator evaluates and pays benefits claims, even when, as here, the administrator is an insurance company and not the beneficiary's employer." *DeLisle*, 558 F.3d at 445. Various circumstances affect the weight we accord the conflict; for example, a long history of biased claims administration may render the conflict more important, but where a claims administrator has taken "active steps to reduce potential bias and to promote accuracy," the conflict "should prove less important." *Glenn*, 128 S. Ct. at 2351.

Here, it appears that Sun Life used a combination of in-house consultants and independent consultants in reviewing Helfman's claim. Accordingly, the conflict of interest due to Sun Life both determining eligibility for benefits and paying those benefits should at least be considered. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005) ("[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism.").

### 2.     *File Review*

Helfman argues that Sun Life's reliance on a file review, in lieu of a physical examination, as well as its failure to interview Dr. Silverman, demonstrate that it did not engage in a principled decision process. Sun Life responds that this "does not

undermine" its determination, as Helfman has not identified any evidence that was overlooked or not considered by Sun Life.

Sun Life is correct that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Yet while this court has found that an administrator is not barred from engaging in a file review in lieu of a physical exam, "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* at 295; *accord, e.g.*, *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008); *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 167 (6th Cir. 2007); *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006).

With regard to interviews of physicians, although persons conducting a file review are not per se required to interview the treating physician, the plan administrator must provide them with all letters from a claimant's physician, which the file reviewer must consider. *See, e.g.*, *Glenn. v. Metro. Life Ins. Co.*, 461 F.3d 660, 671 (6th Cir. 2006) (where "physician charged with conducting the independent file review was not provided" letters that had been submitted by plaintiff's physician to the plan administrator, this was "another factor to be considered in the overall assessment of [administrator's] decision-making process"), *aff'd* 128 S. Ct. 2343.

Here, Sun Life specifically reserved the right, at its own expense, "to have any person, whose Injury or Sickness is the basis of a claim ... examined by a Physician, other health professional or vocational expert of its choice." Because the right to do so was reserved by the plan, its failure to examine Helfman raises questions about the thoroughness and accuracy of its review of his claim, *see, e.g.*, *Calvert*, 409 F.3d at 295, particularly given that, as will be discussed further below, Sun Life made determinations as to Helfman's credibility. Accordingly we find that in the instant case, Sun Life's

decision to conduct only a file review tends to support a finding that its decision-making process was arbitrary and capricious.

On the other hand, although Helfman has also argued that a failure to interview Dr. Silverman supports a finding that its decision was arbitrary and capricious, we disagree. Sun Life did not, by its policy or by other directive, require those persons conducting the file review to interview Dr. Silverman, and although the plan rejected Dr. Silverman's findings, his letters were extensively reviewed. *Cf. Glenn*, 461 F.3d at 471 (reviewing physician failed to consider letters), *aff'd* 128 S. Ct. 2343.

### 3.     *Stress*

We turn now to Helfman's argument that Sun Life inappropriately disregarded his claims that the stress of his job prevented him from working, as well as Dr. Silverman's insistence that Helfman not work lest stress exacerbate his condition and lead to further cardiac episodes. Helfman further contends that Sun Life did not adequately account for stress in his job description. Sun Life determined that stress was merely a factor of Helfman's risk of relapse, not a condition preventing him from performing the material and substantial duties of his occupation. Accordingly, while Sun Life acknowledged that Helfman subjectively believed that stress was keeping him from working, Sun Life found that objectively he was capable of returning to work, with the potential of future cardiac episodes due to stress being a mere risk of relapse.

First, a cursory review of the final letter denying benefits demonstrates that Sun Life did not reach its decision based on a "deliberate, principled reasoning process ... supported by substantial evidence." *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008) (quoting *Glenn*, 461 F.3d at 666). Although in its initial denial of disability benefits Sun Life explained that "it appears that [Dr. Silverman] is basing his subjective support of your disability due to your subjective complaints of the potential for stress at work and not based on objective medical data of an ongoing incapacitating medica condition," in its final decision, Sun Life gave no explanation whatsoever. In its letter dated January 10, 2006, denying benefits, Sun Life simply summarized Mr. Violetta's findings, then summarized Sun Life's review process of the entirety of

opinions, both by Helfman's attending physicians and other medical providers, as well as Sun Life's staff. Although conceding that Helfman's job involved some stress, Sun Life asserted in a conclusory fashion that "when considering the duties of Mr. Helfman's occupation, and the medical documentation on file, we have determined that he retains the capacity to perform the essential duties of his own occupation, and that he does not satisfy the policy definition of "Total Disability' as previously defined." There is no further explanation of its reasons for rejecting Dr. Silverman's findings that stress would prevent him from working. This failure to explain its decision whatsoever is of particular concern and supports a finding that Sun Life did not engage in a deliberate, reasoned decision-making process. Moreover, given that each review of Helfman's claim was de novo under the policy terms, Sun Life could in no way rely on the reasons for denying benefits enumerated in its previous letter.

Yet even where Sun Life explained its decision, we are troubled by the stated reasons therefor. In its initial letter terminating LTD benefits, Sun Life explained that it merely found stress to be a factor in Helfman's risk of relapse, rather than an objective medical condition preventing him from working. This court, however, has previously rejected such arguments. In *Evans v. UnumProvident Corp.*, 434 F.3d 866 (6th Cir. 2006), Evans's doctor had repeatedly emphasized that a high-stress position would exacerbate her epilepsy condition, as it had in the past. Physicians conducting a file review of Evans's file nonetheless rejected her physician's admonition that she not work due to the stress attendant thereto, deeming "stress ... merely a 'prophylactic' factor that should be accorded minimal, if any, weight in determination of disability." *Id.* at 879. We rejected this argument, finding that because "so-called 'prophylactic' restrictions are not precluded from consideration under the terms of the LTD policy," the administrator's failure to account for the stress Evans suffered while working, which had been shown to precipitate her seizures, was a factor rendering the defendant's denial of benefits arbitrary and capricious. *Id.* at 879.

We followed *Evans* in *Glenn v. Metropolitan Life Insurance Co.*, 461 F.3d 660 (6th Cir. 2006), *aff'd* 128 S. Ct. 2343. There, the claimant suffered from

cardiomyopathy, "a disease of the heart muscle that causes the heart to become enlarged and, for that reason, to pump inadequately." *Id.* at 662. We found that the claimant's doctor had been similarly "'unwavering' in his opinion that stress is an important factor in her condition." *Id.* at 673. The claimant's plan, like in *Evans*, did not specifically exclude prophylactic considerations as irrelevant to the determination of disability or "say that self-reported or 'subjective' factors should be accorded less significance than other indicators." *Id.* Accordingly, while we conceded that stress may not be "*the* most important factor in all cases of cardiomyopathy, as it apparently is with epilepsy," nevertheless we found that it was "unreasonable for MetLife to have dismissed stress as an improperly documented, subjective, and irrelevant factor in its disability determination." *Id.*

Likewise, in the instant case, the terms of Helfman's LTD policy do not preclude "prophylactic" restrictions and limitations on Helfman's ability to work from consideration. Yet like the defendants in *Evans* and in *Glenn*, Sun Life rejected Dr. Silverman's suggested restrictions and limitations from work on the basis of their being prophylactic factors to prevent Helfman's condition from worsening in the future. Because the terms of the policy do not preclude prophylactic factors from consideration when determining whether an employee can perform his occupation, the administrator's rejection as such is a factor weighing in favor of a finding that the decision was arbitrary and capricious. *Glenn* further supports a finding that stress may be a factor in individuals with heart conditions that may prevent them from working.

Moreover, Sun Life's rejection of Helfman's claims of stress as a subjective complaint is inappropriate. The fact that stress is highly subjective does not, under the terms of the policy, render it irrelevant to a determination of disability. *Glenn*, 461 F.3d at 673. Rather, the terms of the policy require the administrator to determine whether a particular employee is able to perform the material and substantial duties of his occupation. This is by its very terms subjective. Simply because another individual could easily handle the stress of his occupation does not mean that Helfman therefore can perform the material and substantial duties of his occupation. As Mr. Violetta

conceded, persons may experience varying levels of stress even when performing the same job and facing the same situation.

Finally, in rejecting Helfman's claims of stress based on their subjective nature, it appears that Sun Life implicitly made a credibility determination as to the nature and extent of Helfman's stress.  As this court has repeatedly found, however, where an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary.  *See, e.g.*, *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263-64 (6th Cir. 2006) ("[W]e consider CCC's decision to *not* require an examination as part of the arbitrary and capricious review, especially because Kaplan made credibility determinations concerning Smith's subjective complaints....  Their decision to not perform this examination supports the finding that their determination was arbitrary."); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296-97 (6th Cir. 2005) (determinations of credibility made without having met or examined claimant and contrary to findings of treating physician supports finding that denial of benefits was arbitrary and capricious).

In sum, Sun Life's thoroughness with regard to Helfman's stress is to be questioned, based on its disregard of Dr. Silverman's admonition that Helfman not work; its dismissal of claims of stress as purely subjective and therefore not relevant; and its failure to conduct a physical examination.

Based on the above review of Sun Life's decision-making process, we find that Sun Life's denial of Helfman's disability benefits was arbitrary and capricious.  While none of the factors alone is dispositive, we find that, as a whole, they support a finding that Sun Life did not engage in a deliberate and principled reasoning process.  We so conclude despite the high deference accorded the plan administrator under the arbitrary-and-capricious standard of review, as this deference "does not mean our review must also be inconsequential.  While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. UnumProvident Corp.*,

405 F.3d 373, 379 (6th Cir. 2005); *accord, e.g.*, *Kramer v. Paul Revere Life Ins. Co.*, ___ F.3d ___, No. 07-1552, 2009 WL 928573, at *8 (6th Cir. Apr. 8, 2009).

We do not, however, find that the record clearly establishes that Helfman is disabled and that he is therefore entitled to judgment in his favor. "'[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled,'" remand to the plan administrator is the appropriate remedy. *Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006)). Although the integrity of the decision-making process has certainly been questioned, it does not appear that claimant is *clearly* entitled to benefits. Accordingly, we remand to the district court with instructions to remand to the plan administrator to provide a full and fair review. *See, e.g.*, Elliott, 473 F.3d at 622-23 (remanding case for a full and fair inquiry because not "clearly" entitled to benefits); *Smith v. Cont'l Cas. Co.*, 450 F.3d 254, 255 (6th Cir. 2006) (same); *but see, e.g.*, *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 675 (6th Cir. 2006) (awarding retroactive benefits in lieu of remand), *aff'd on other grounds*, 128 S. Ct. 2343.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court in part, insofar as the district court held that the plan is subject to ERISA, and **REVERSE AND REMAND** insofar as the district court upheld the denial of benefits by Sun Life as neither arbitrary nor capricious, with instructions to remand to the plan administrator for a full and fair review.