**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0994n.06
Filed: December 20, 2005

**No. 05-1090**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MONIKA J. BOONE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LIBERTY LIFE ASSURANCE COMPANY | ) | WESTERN DISTRICT OF MICHIGAN |
| OF BOSTON, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: NELSON, DAUGHTREY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. In this appeal, Monika Boone challenges the district court's resolution of her claim against Liberty Life Assurance Company for long-term disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. As Liberty's decision to deny benefits was neither arbitrary nor capricious, we affirm.

I.

On June 14, 2001, Boone suffered a whiplash injury from a car accident. She tried to return to her job at Steelcase, Ltd. the next day but found herself to be in too much pain. Her personal physician, Dr. J.D. Maskill, diagnosed her as having a "cervical strain" and filled out a form to

excuse her from work from June 24 to July 9, 2001. He issued similar doctor's notes on July 16, August 7, August 24, September 7, September 21 and October 19 of 2001.

The Steelcase disability plan has three tiers. For the first six months after an injury, Steelcase self-insures a short-term disability program administered by Liberty. After that period, Steelcase self-insures, and Liberty administers, the initial six months of the long-term disability plan. In those first six months of long-term coverage, a participant is "disabled" if she "is unable to perform the Material and Substantial Duties of [her] Own Occupation." JA 80. After these six months (after, in other words, a full year from the disabling injury), Liberty insures and administers the remainder of the long-term disability coverage. "Disability" under this portion of the plan is defined as an "inability to perform the usual duties of Any Occupation or any other suitable job that meets [her] restrictions, or for Any Occupation for which [she] is or may reasonably become qualified based on [her] education, training or experience." *Id.*

From June 2001 to December 2001, Liberty approved Boone for short-term disability benefits. During that time, Dr. Maskill referred her to physical therapy, where Boone reported continued pain measuring 80 on a scale of 100 "in the right shoulder to the middle of the neck to the head" and "difficulty with sleeping secondary to pain, soreness in the morning, increased pain with computer work and with reading, pain and difficulty with driving the car secondary to problems turning the head." JA 231. Boone ended physical therapy on November 21, 2001, with the therapist noting that Boone had "plateaued" and that the "max[imum] benefit [had already been] achieved." JA 241.

On November 27, 2001, Dr. Maskill referred Boone to Dr. Peter Herkner, an orthopedic specialist, who noted that she reported that "sitting, standing, lying down, twisting, and lifting[] aggravate her symptoms." JA 201. After examining her, Dr. Herkner noted that while Boone is "quite guarded" in her spinal movements, "[s]he is not tender to palpation," "[t]here is no appreciable spasm . . . in the paracervical muscles," there is "no visible atrophy in the upper extremities," "[s]he has intact biceps, triceps" and "[t]here are no strength or sensory deficits in the upper extremities." JA 202. He observed that her x-rays showed "some narrowing at C5–6," but he indicated that "the alignment is satisfactory," there are "no erosive or destructive changes" and there is "no evidence of subluxation or alignment pathology." *Id*. He finally diagnosed her with cervical spondylosis, a common degenerative disease of the spine, and called for an MRI, but noted that treatment would likely focus on helping Boone "deal with the dilemma, as opposed to offering her a cure." JA 203. To that end, Dr. Herkner stated that his plan for the patient was to enroll her in the PEAK Program at Rehab Professionals, a pain management program that combines physical and mental therapy with medication and other courses of treatment.

While Boone was waiting to have an MRI and to begin the PEAK program, Steelcase's short-term disability program expired and Liberty considered her eligibility for the first six months of long-term disability. On January 9, 2002, Liberty requested medical records from Boone's doctors. Dr. Herkner replied that the MRI "shows slight narrowing and dessication at 4–5" and "Monika has failed the traditional approach to her symptomatic cervical spondylosis." JA 448. Based largely on

Dr. Herkner's ongoing treatment, Liberty approved Boone for the first six months of long-term disability coverage.

Boone began the PEAK program at the end of May 2002 and was discharged on June 28, 2002, for lack of progress. Her physical therapist, Sharon Leeder, wrote in the discharge summary: "We had repeatedly established plans in which the patient was involved in identifying goals to be achieved throughout the week with functional improvements to take place. There was very little follow through from a functional standpoint and significant increase in subjective complaints." JA 197. Leeder also indicated that there was little "progress with the patient with regard[] to increasing her ability to manage things." *Id*. She noted that Boone and her husband were resistant to aiming for a return to work until Boone could better manage herself at home. "I do not recommend," Leeder concluded, "any further physical therapy at this time secondary to very limited follow through and feel that the patient should continue with her stretching and conditioning regimen[]." *Id*. Dr. Michael Jakubowski, the head of PEAK, added that Boone "is not following through functionally with basic day-to-day activities at home. She is not performing those or filling out the logs or bringing back to us concerns about particular difficulties she is having with them. She just states that she cannot do them." JA 198. He concluded that "[i]n the face of this lack of progress, there is no reasonable reason to pursue further treatment here. I cannot ascribe all of her findings to physiologic causes." *Id*.

On April 30, 2002, with the first six months of long-term disability approaching an end (on June 30, 2002), Liberty sent a letter to Boone informing her that the definition of disability for the

program would change and that the company would be contacting her doctors for records to determine if she remained eligible for coverage. In response, Dr. Herkner noted that he had last seen Boone on January 18, 2002, and that he had recommended her for PEAK. Asked whether the patient had responded to the treatment plan, Herkner replied, "Yes, patient is going to PEAK program." JA 364. He also noted that Boone "may not work at all" until such time as "to be determined pending [the] PEAK eval[uation]." *Id.* Dr. Maskill returned a similar restrictions form, diagnosing Boone with "chronic cervical strain" and stating that she was "unable to work secondary to pain." JA 298. The form noted that she had not responded to the treatment plan of "ortho[pedic] referral [and] med[ication]." *Id.*

From June 7 until June 24, 2002, Liberty hired a surveillance firm to observe Boone's daily activities. The resulting report noted that Boone "does not appear to be physically handicapped nor does she wear any visible back brace or cervical collar" and that she "engaged in physical activities including turning her head in a normal fashion." JA 318. Video footage compiled by the firm showed Boone walking, standing, carrying flowers and entering a vehicle in a normal fashion.

On July 25, 2002, Liberty denied Boone's application for continued benefits. While Liberty acknowledged that she had a "certain amount of neck pain," the company concluded in a letter sent to Boone that "we do not know your restrictions and limitations, nor your treatment plan." JA 303. The letter reserved the right to make further determinations based on any other information provided.

On September 12, 2002, Boone administratively appealed the decision. Liberty asked Susan Terry, a registered nurse, to evaluate the appeal. Terry obtained Boone's PEAK file as well as the old x-rays, MRI, doctors' notes and restriction forms. She concluded that Boone suffered "what is essentially a whiplash injury" but that there "is no objective medical evidence of any cervical disc, spinal cord or nerve root pathology." JA 117. The report noted that Boone had spondylosis of C5–6, which is "part of the normal aging process [and] is consistent with her age." *Id*. The report proceeded to note that Drs. Jakubowski and Herkner had observed that Boone's subjective reports of pain could not be explained based only on physiology. The report concluded that "there is a distinct lack of any positive physical findings that indicate any significant impairment" and "no objective medical evidence of impairment that substantiates an inability to perform meaningful physical activity on a consistent, dependable basis." *Id*. Based on this report, Liberty upheld its denial of coverage, adopting Terry's conclusion as the reason.

On February 9, 2004, Boone filed this lawsuit under ERISA, 29 U.S.C. § 1132, claiming a breach of fiduciary duty by Liberty and a right to recover benefits. Liberty moved for judgment on the administrative record. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998). The district court concluded that "Liberty Life's denial of benefits was rational in light of both the medical evidence and the Policy's provisions." D. Ct. Op. at 11, JA 65.

II.

When an ERISA disability plan gives the administrator discretionary authority to determine eligibility for benefits, as this one does, we evaluate a challenge to the administrator's eligibility determination not for mere error but for arbitrary and capricious error. *See Gismondi v. United Tech. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In this case, the relevant portion of the plan states that "[t]he benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued: 1. Disability; 2. Regular Attendance of a Physician; and 3. Appropriate Available Treatment." JA 90. Proof is defined in part as "the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of *objective medical evidence* in support of a claim for benefits." JA 83 (emphasis added).

On appeal, Boone claims that the pain in her back and neck is so severe that she qualifies as disabled under Steelcase's long-term disability plan. She complains that movement in general (including walking) and postural stresses in particular (including sitting, standing, lying down, twisting and lifting) aggravate her pain to the point where she cannot work. The only objective records of Boone's pain made available to Liberty, however, were the June 2001 x-rays taken immediately after her accident, the November 2001 x-rays taken by Dr. Herkner and the January 2002 MRI. In analyzing these tests, Nurse Terry concluded that Boone had "minor spondylosis at C5–6," which is "normal for aging." JA 118. She also noted "disc bulging at C5–6 without nerve

or cord compression." JA 118. "[T]here is no objective medical evidence," she concluded, "of any cervical disc, spinal cord or nerve root pathology." JA 117.

Aside from unsupported and unexplained statements from her doctors that Boone "[is] unable to work secondary to pain," that she "may not work at all" and that she has "intolerable pain in neck," JA 298–300, Boone has not refuted Terry's conclusion, and indeed many of her doctors' diagnoses are consistent with Terry's analysis. For example, Boone's orthopedic specialist, Dr. Herkner, diagnosed her with "cervical spondylosis with discogenic mechanical neck pain." JA 202. The analysis of the January 2002 MRI lists the spondylosis as "mild," JA 204, and Dr. Herkner noted in his review that there was no "significant compression," JA 199. In reviewing the x-rays, he noted that "[n]o erosive or destructive changes are identified." JA 202. Dr. Maskill diagnosed her with "chronic cervical strain" but he reported no objective evidence upon which to base his diagnosis. JA 298. Finally, the specialists, Drs. Herkner and Jakubowski, each could not meaningfully connect Boone's complaints of pain to the physical conditions that they observed. *See* JA 203 ("The etiology of the patient's pain remains obscure."); JA 198 ("I cannot ascribe all of her findings to physiologic causes.").

In addition, PEAK's psychologist noted "some symptom magnification." JA 195. The physical therapists in the PEAK program reported that Boone was resistant to talking about returning to work even when her symptoms appeared to be abating. They also reported that her husband demanded that she return to doing all household chores and be "back to normal" before returning to work. JA 169–70. "She tends to think," the PEAK doctors noted, "that there will be no activities she

can perform which are enjoyable if she cannot find some way to be rid of 100% of her pain." JA 166. Independent observations by a surveillance firm hired by Liberty—showing Boone walking, carrying flowers, getting into and out of cars, and leaving the house for extended periods of time—also undermined Boone's application. In the end, Terry concluded that an evaluation of Boone's file showed a "distinct lack of any positive physical findings that indicate any significant impairment." JA 117.

In reviewing a plan administrator's denial of benefits, we of course are not a "rubber stamp." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). But the determination must be upheld if the "decision regarding eligibility for benefits . . . is rational in light of the plan's provisions." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002) (quotations omitted). On this record, we cannot conclude that Liberty acted irrationally in denying Boone's appeal on the ground that there is a "lack of any positive physical findings that indicate any significant impairment that would substantiate an inability to perform any occupation." JA 133.

Attempting to forestall this conclusion, Boone argues that Liberty has "arbitrarily disregard[ed] the assessments and instructions of [her] medical doctors." Boone Br. at 21. Liberty, true enough, has not embraced the disability conclusions of these doctors. But it has not "arbitrarily disregarded" them: It chose not to credit them because they were not supported by objective medical evidence, which is what the plan requires. In the context of an ERISA disability plan, moreover, neither courts nor plan administrators must give special deference to the opinions of treating physicians. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have

no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

Boone next argues that Liberty did not engage an independent physician to undertake an analysis of her claim but relied on a nurse (Terry) to do so. But this circuit has never held that a plan administrator must hire a physician to undertake an independent review of an applicant's records before denying benefits. *See, e.g.*, *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996); *see also Wages v. Sandler, O'Neill & Partners, L.P.*, No. 00-5994, 2002 U.S. App. LEXIS 3535 (6th Cir. March 1, 2002). And the circuit has upheld the decision of a plan administrator where a nurse reviewed the medical evidence. *See Wages*, 2002 U.S. App. LEXIS 3535, at *4. At all events, Boone has not explained what reports and diagnoses submitted in support of her application would have been appreciated by a doctor but were beyond the ken of Nurse Terry.

Boone next points out that Liberty granted her disability benefits in January 2002 but denied them in July 2002 even though there was no discernible change in her physical condition during these six months. A significant difference in the plan's definition of disability, however, provides one explanation for the two decisions. During the first six months of long-term coverage under the plan, a participant is "disabled" if she "is unable to perform the Material and Substantial Duties of [her] Own Occupation," while after six months the plan requires the applicant to show that she is unable "to perform the usual duties of Any Occupation or any other suitable job that meets [her] restrictions, or for Any Occupation for which she is or may reasonably become qualified based on [her] education,

training or experience." JA 80. Her plan of treatment provides another explanation for the difference: In January 2002 Boone still was pursuing an appropriate course of treatment (the PEAK program), something that was no longer true in July 2002.

Boone, lastly, claims that another inconsistency undermines the plan administrator's decision —namely, that between the initial July 2002 decision and the December 2002 appeal, Liberty changed its reason for denying her benefits. Liberty's reason for initially denying benefits (a failure to provide sufficient medical data) was indeed different from its later decision to uphold the denial of benefits (an absence of objective medical evidence establishing disability). Yet the record supports the change. Much of the data that Liberty requested from Boone's physicians on May 24, 2002, and then requested again on July 9, 2002, was not received until after Liberty's July 2002 determination. Liberty initially denied the claim because all that it had received, despite repeated requests, was a partially filled out restrictions sheet, which provided none of the medical information that Liberty required. Once Liberty received sufficient information to evaluate Boone's medical claims, it performed a review of the records, which failed to establish objective evidence of a disabling condition. There is, in short, no arbitrary inconsistency between the two decisions.

III.

For these reasons, we affirm.