**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0572n.06

Case No. 16-2707

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| REBECCA FILTHAUT, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AT&T MIDWEST DISABILITY BENEFIT PLAN, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant, | ) | |
| | ) | |
| AT&T UMBRELLA BENEFIT PLAN NO. 3, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: ROGERS, COOK, and STRANCH, Circuit Judges.

COOK, Circuit Judge. Experiencing lower back pain, Rebecca Filthaut made three claims for short-term disability benefits under her employer's disability plan, each of which the claims administrator denied. She sued, alleging a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). The district court granted summary judgment to Filthaut on two of her claims. But because the claims administrator's denial of benefits was neither arbitrary nor capricious, we REVERSE the district court's judgment.

## I. BACKGROUND

Filthaut works at Michigan Bell Telephone Company as a call center service representative, a sedentary job. Through her employment, Filthaut participates in the AT&T Midwest Disability Benefits Program, which is a component of the AT&T Umbrella Benefit Plan No. 3 ("the Plan").

*(a) Disability Plan*

Four provisions of the disability plan are salient here.

First, the Plan gives the claims administrator discretion to interpret the disability plan's terms and determine benefits eligibility.

Second, a Plan participant is entitled to disability benefits

if the Claims Administrator determines that [the participant is] Disabled by reason of sickness, pregnancy, or an off-the[-]job illness or injury that prevents [the participant] from performing the duties of [her] job (or any other job assigned by the Company for which [she is] qualified) with or without reasonable accommodation. [The] Disability must be supported by objective Medical Evidence.

Third, the disability plan defines "medical evidence" as

[o]bjective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator. Objective medical information includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession. In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability.

Fourth, the Plan reserves for the claims administrator the right to order a physical examination of the claimant.

*(b) Filthaut's Treatment History*

Filthaut's short-term disability claims stem from lower back pain, which a January 2012 partial right nephrectomy for kidney cancer largely resolved. The pain slowly returned, however, prompting Filthaut to visit three physicians.

In August 2013, Dr. Mohammad Al Nouri diagnosed Filthaut with lumbar degenerative disc disease and spondylosis (another term for spinal degeneration). He administered two epidural steroid injections over the next few months, but they proved ineffective at controlling Filthaut's pain. Filthaut visited Dr. Al Nouri again in December 2013. He found that she had normal motor strength and retained "full range of motion" with respect to "[f]lexion, extension and lateral movement." Dr. Al Nouri referred Filthaut for physical therapy, which she began shortly thereafter.

Dr. Richard Kovar, a neurologist, examined Filthaut in January 2014. He identified "a myofascial strain pattern involving the right mid to lower ribs including thoracolumbar fascia and including the right lower scapular region with multiple segmental somatic dysfunctions noted throughout the thoracic region"—in other words, several strained ribs. Filthaut's neurologic evaluation was normal; her "[m]otor [e]xamination show[ed] good bulk and tone," and her arm and leg "[s]trength [was] 5/5."

Filthaut also visited Dr. George Carley, a family care physician. In December 2013, Dr. Carley wrote in his initial physician statement that Filthaut reported "pain in spine" and "constant pain" in her right kidney. Dr. Carley recommended "no work" for a month. Filthaut saw Dr. Carley again in March 2014, at which time Filthaut complained of "severe low back pain" and was "unable to ambulate." In the section of his report regarding Filthaut's "current functional restrictions," Dr. Carley wrote "no work." Yet Dr. Carley also prescribed multiple "at

work" accommodations for Filthaut: breaks every five minutes, no sitting or standing for more than five-to-ten minutes, no lifting over two pounds, no reaching over her head, no bending, no twisting, no kneeling, and no stooping.

*(c) Claim 1 (January 13 – February 23, 2014)*

Filthaut first sought short-term disability benefits for the period between January 13 and February 23, 2014, which the claims administrator denied both initially and on appeal. The district court upheld the denial of Claim 1 benefits, and Filthaut has not appealed; we therefore do not recite Claim 1's details here.

*(d) Claim 2 (March 3 – April 14, 2014)*

Filthaut briefly returned to work but began another leave on March 3, 2014, prompting the claims administrator to initiate a claim for Filthaut's relapse absence. Dr. Leela Rangaswamy, an orthopedic surgeon, conducted the independent physician advisor review of Filthaut's records. In her report, she referenced Dr. Carley's physician statement listing various work restrictions and limitations, but noted that the statement did "not include a detailed physical examination." Dr. Rangaswamy—who left a voicemail for Dr. Carley but never connected with him—identified no "well-defined focal physical findings that would substantiate" Dr. Carley's determination that Filthaut could not work. Relying on Dr. Rangaswamy's report, the claims administrator denied Filthaut's disability claim.

Filthaut appealed for the period between March 3 and April 14, citing her back and kidney problems. The claims administrator referred the matter for additional independent physician advisor reviews in nephrology and physical-medicine-and-rehabilitation/pain medicine ("PM&R/pain medicine").

Dr. Laurence Friedman, the reviewing nephrologist, spoke with Dr. Carley, who "reported that Ms. Filthaut has a complex chronic pain disorder on the basis of musculoskeletal disease and that there are no other renal issues beyond her previous partial nephrectomy for cancer." From his review of the records and conversation with Dr. Carley, Dr. Friedman found that Filthaut had "no issues from the nephrology standpoint affecting her functional capacity/ability to work."

Dr. Howard Grattan, the reviewing PM&R/pain medicine physician, attempted to, but could not, connect with Dr. Carley or Dr. Sandy Payne, Filthaut's physical therapist. Nonetheless, he "reviewed the clinical notes, claim documents, diagnostics, claimant's job description and appeal letter." In his report, Dr. Grattan noted Filthaut's back and kidney pain but concluded that "there are no measurable objective findings that would support restrictions, limitations and/or disability from [Filthaut's] regular job."

The claims administrator upheld the denial of benefits. The appeal-denial letter summarized Dr. Friedman's and Dr. Grattan's reports, explaining that no measurable objective findings were "documented to be so severe as to prevent [Filthaut] from performing the job duties of a Service Representative with or without reasonable accommodation" during the six-week period.

*(e) Claim 3 (April 16 – May 7, 2014)*

Filthaut returned to work for one day before beginning another leave on April 16, 2014. The claims administrator opened a new claim; contacted Filthaut three times over the course of the next ten days to advise her that "medical records were needed to support short term disability"; and called Dr. Carley twice, but never received a response.

Because it had not received "objective medical information to support [Filthaut's] inability to perform [her] job as a Service Representative with or without reasonable accommodations," the claims administrator denied the claim. Filthaut appealed for the period between April 16 and May 7, again citing her back and kidney conditions. The claims administrator then referred the matter for an independent physician review.

Dr. Moshe Lewis, the reviewing PM&R physician, left two voicemails for Dr. Carley but never received a return call. In his report, Dr. Lewis noted the work restrictions prescribed by Dr. Carley, plus Filthaut's lumbar strain and history of lumbar degenerative disc disease that had been unresponsive to Neurontin, Tramadol, and epidural injections. He also summarized Dr. Kovar's finding that Filthaut suffered no neurologic deficits and had 5/5 motor strength. Based on his review of Filthaut's medical records and Claim 2 file, Dr. Lewis concluded that "from a PM&R perspective the claimant is capable of any work and can complete her sedentary job without restrictions."

The claims administrator upheld the denial of benefits. The appeal-denial letter explained Dr. Lewis's report and that the objective findings in the medical records were not severe enough to prevent Filthaut from performing her job with or without reasonable accommodation during the three-week period.

*(f) Procedural History*

Having exhausted her administrative remedies, Filthaut filed suit, alleging that the Plan wrongfully denied her short-term disability benefits. The Plan moved for judgment on the administrative record, and Filthaut moved for summary judgment granting her benefits.

The district court denied Filthaut's motion for summary judgment as to Claim 1. It granted Filthaut's motion as to Claims 2 and 3, however, finding that the denial of those short-term disability benefits was arbitrary and capricious.

The Plan timely appeals the district court's decision regarding Claims 2 and 3.

## II. STANDARD OF REVIEW

ERISA grants a plan participant the right "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). We review de novo a district court's "judgment in an ERISA disability benefit action based on an administrative record and apply the same legal standard as did the district court." *Glenn v. MetLife*, 461 F.3d 660, 665 (6th Cir. 2006) (citation omitted), *aff'd,* 554 U.S. 105 (2008). When, as both parties agree is the case here, the plan grants its administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), we review the administrator's decision under the arbitrary and capricious standard, *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008) (citation omitted).

Arbitrary and capricious review "requires us to defer to the underlying decision so long as it is rational in light of the plan's provisions." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 567 (6th Cir. 2013) (citation omitted); *see Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) ("[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious."). We must "uphold the administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Glenn*, 461 F.3d at 666 (quoting *Baker v. United Mine*

*Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). "This standard 'is the least demanding form of judicial review of administrative action.'" *Shields v. Reader's Digest Ass'n*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). That being said, however, "deferential review is not *no* review," *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (internal quotation marks and citation omitted), and "application of the standard requires us to review the quality and quantity of the medical evidence and the opinions on both sides of the issues," *Bennett*, 514 F.3d at 552 (internal quotation marks and citations omitted).

### III. ANALYSIS

To determine whether the denial of benefits was arbitrary or capricious, we consider the "guideposts that have been established by this Circuit with regard to ERISA benefit determinations." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876–77 (6th Cir. 2006). Given Filthaut's and the district court's reliance on *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538 (6th Cir. 2015), we begin our analysis there.

Like Filthaut, the *Shaw* plaintiff worked as a customer service representative for Michigan Bell, stopped working due to chronic pain, and was covered under the same benefits program. *Shaw*, 795 F.3d at 541. A divided panel concluded that the defendant arbitrarily and capriciously denied the plaintiff long-term disability benefits for four reasons: "it ignored favorable evidence submitted by his treating physicians, selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating physicians." *Id.* at 547. *Shaw* noted that although "none of the factors alone is dispositive," taken together "they support a finding that [the administrator] did

not engage in a deliberate and principled reasoning process." *Id.* at 551 (quoting *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009)).

The Plan argues relentlessly that we are not bound by *Shaw*. The Plan is wrong. "A published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)).

*Shaw* found the claims administrator's "decision-making process" rife with "flagrant errors" that, in the aggregate, failed to reflect deliberate and principled reasoning. *Shaw*, 795 F.3d at 551 (citation omitted). Because the facts in *Shaw* are distinguishable from those here, we reach a different conclusion.

*(a)      Consideration of Evidence from Filthaut's Treating Physicians*

Filthaut faults the Plan for ignoring favorable evidence submitted by her treating physicians. The Plan argues that the claims administrator neither ignored Filthaut's evidence nor improperly relied upon the opinions of the independent physician advisors. We agree with the Plan.

"[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Likewise, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834. "However, [administrators] 'may not arbitrarily refuse to

credit a claimant's reliable evidence, including the opinions of a treating physician.'" *Shaw*, 795 F.3d at 548 (quoting *Nord*, 538 U.S. at 834).

With respect to Claim 2, the claims administrator neither ignored nor arbitrarily refused to credit the opinions of Filthaut's treating physicians. In her independent review, Dr. Rangaswamy specifically referenced Dr. Carley's statement "document[ing] that [Filthaut] had severe low back pain, neck pain, kidney pain and bilateral leg pain," plus the work restrictions and limitations that Dr. Carley advised. Dr. Rangaswamy went on to note, however, that Dr. Carley's "form does not include a detailed physical examination" or "documentation of well-defined focal physical findings commensurate with a specific disability." When Filthaut appealed the initial benefits determination, Drs. Friedman and Grattan reviewed Filthaut's medical records dating back to August 2013. Both of their reports reflect that they assessed all three treating physicians' write-ups (Dr. Grattan's mentions the physical therapy notes, too), and that neither reviewing doctor could discern measurable objective findings evidencing disability. Per the appeal-denial letter, the claims administrator considered all of Filthaut's medical records and the independent physician advisor reviews before deciding to uphold the denial of benefits.

Claim 3 is no different. The claims administrator denied benefits initially because it "received no objective medical information to support" Filthaut's disability claim, even though it contacted Filthaut three times and Dr. Carley twice to ask for such information. On appeal, Dr. Lewis received Filthaut's "medical and non-medical records," which he "thoroughly reviewed." Among other aspects of the treating physicians' reports, he documented Dr. Kovar's conclusion that Filthaut suffered no neurologic deficits and maintained "5/5" motor strength. He also mentioned Filthaut's work limitations as advised by Dr. Carley. But given his review of the overall record, Dr. Lewis ultimately determined that, from a PM&R perspective, Filthaut could

"complete her sedentary job without restrictions." Again, the claims administrator considered the entirety of Filthaut's file before upholding the denial of benefits based on a lack of objective medical evidence.

Filthaut criticizes Dr. Lewis for acknowledging the various accommodations (i.e., constant breaks, limited lifting, sitting or standing for only five-to-ten minutes at a time) prescribed by Dr. Carley, but concluding nonetheless that she could work without restrictions. Dr. Lewis, however, reviewed the reports written by the other independent physician advisors who, "throughout the year have not noted a basis for disability from a sedentary job based on the medical records." Those reports concluded that Filthaut's records lacked objective medical findings sufficient to establish a disability under the plan's terms. Dr. Lewis does not explicitly state this in his report, but his reference to the other physician advisors' reports implies his agreement with their conclusions. And although the claims administrator did not embrace Dr. Carley's disability conclusions, it did not arbitrarily discount them—it refused to credit them because they lacked support by objective medical evidence, as required by the Plan. *See Boone v. Liberty Life Assurance Co. of Bos.*, 161 F. App'x 469, 473 (6th Cir. 2005).

Filthaut also argues that the Plan ignored favorable evidence from Dr. Carley because the independent physician advisors allowed him only 24 hours to respond to their voicemails. Giving "the treating physicians only 24 hours to respond to their requests before they made their disability decisions based on available medical information . . . . [is an] unreasonable deadline." *Shaw*, 795 F.3d at 549 (internal quotation marks omitted). Although Filthaut's contention holds water with respect to Drs. Rangaswamy and Grattan, it does not with respect to Drs. Friedman and Lewis—Dr. Friedman spoke with Dr. Carley, and Dr. Lewis left messages for Dr. Carley on June 13 and June 17 before completing his file review on June 19. And, in any event, "persons

conducting a file review are not per se required to interview the treating physician." *Helfman*, 573 F.3d at 393.

> At bottom,

> when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*Evans*, 434 F.3d at 877 (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003)); *see also Boone*, 161 F. App'x at 473–74 ("In the context of an ERISA disability plan . . . neither courts nor plan administrators must give special deference to the opinions of treating physicians.") (citing *Nord*, 538 U.S. at 834)). That is what happened here: the independent physician advisors each assessed all of the documents that Filthaut submitted, and the claims administrator relied on their conclusions over Dr. Carley's.

*(b) Reviewing Evidence Submitted by Treating Physicians*

"An administrator acts arbitrarily and capriciously when it 'engages in a selective review of the administrative record to justify a decision to terminate coverage.'" *Shaw*, 795 F.3d at 549 (quoting *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007)). Relying on this rule, the district court criticized Dr. Friedman for "selectively reviewing" the Claim 2 file. But our review of the record leads us to conclude otherwise.

Dr. Carley told Dr. Friedman that Filthaut suffered no renal issues beyond her partial nephrectomy in early 2012. Based on that phone call and his review of the record, Dr. Friedman determined that Filthaut was not disabled "from the nephrology standpoint." The district court noted that "Dr. Friedman based his decision on the Plaintiff's kidneys—which are not part of the musculoskeletal system." But this should not have surprised the district court: Dr. Friedman is a

nephrologist; kidneys are his specialty. The district court also overlooked the fact that Dr. Grattan reviewed Claim 2 and reached the same conclusion from a PM&R/pain medicine perspective.

*Shaw* does not compel a different result. There, the reviewing physicians actually ignored or misstated evidence submitted by the treating physicians. One reviewer suggested that Shaw disregarded medical advice by forgoing surgery, even though both treating physicians identified physical therapy as an alternative treatment. *Id.* at 549–50. Another reviewer stated that Shaw did not provide recent objective range-of-motion measurements, even though the very next sentence of his report referenced range-of-motion measurements. *Id.* at 549. The record here does not reflect such egregious errors, and we do not discern any selective review by the physicians who evaluated Filthaut's files.

### (c) Conducting a File-Only Review

The Plan argues that it properly relied on the independent physician advisor reviews instead of ordering its own physical examination of Filthaut. Filthaut disagrees. Although we see merit in both positions, we find the Plan's more persuasive in this instance.

We consider an administrator's decision to conduct a file review rather than a physical examination as one factor in its overall assessment of whether the administrator acted arbitrarily and capriciously. *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Although "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly . . . the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* Because the Plan reserves its right to conduct its own physical evaluation if the claims administrator determines one is

necessary, we consider "whether the file review conducted in the present case is of the kind to which this court has taken exception." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013).

One situation in which this court has faulted a file-only review is "where the file reviewer concludes that the claimant is not credible without having actually examined him or her." *Id.* (citing *Bennett*, 514 F.3d at 555). Furthermore, "this court has discounted a file review when the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Id.* (citing *Elliott*, 473 F.3d at 621).

Weighing in Filthaut's favor, the claims administrator made a credibility determination when it discounted Dr. Carley's conclusions because, as the Plan stated in its brief, those conclusions "reli[ed] on Ms. Filthaut's self-reported pain, rather than objective testing to establish her restrictions." *See Shaw*, 795 F.3d at 550 ("The Plan made a credibility determination when it discounted Dr. Reincke's medical records because they were based solely on Shaw's own subjective complaints of pain." (internal quotation marks omitted)); *but see Bell v. Ameritech Sickness & Accident Disability Benefit Plan*, 399 F. App'x 991, 1000 (6th Cir. 2010) ("[N]either the Plan nor the [reviewing] doctors rendered credibility determinations or second-guessed the medical opinions of Bell's physicians. Rather, they simply determined that the objective medical documentation in the record did not, on its own, support a finding of disability. This was not improper or arbitrary, but rather was consistent with the Plan's definition of disability."). Faulting Filthaut for lacking objective medical evidence, the claims administrator could have ordered an examination to determine the veracity of her self-reported pain. *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263–64 (6th Cir. 2006) ("CCC has reserved the right to obtain an independent medical examination of a claimant. . . . CCC could have

obtained an independent medical examination to evaluate Smith's pain. Their decision to not perform this examination supports the finding that their determination was arbitrary."); *Calvert*, 409 F.3d at 297 n.6 (explaining that when the conclusions drawn from a file-only "review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate").

By the same token, the claims administrator made a credibility determination when it dismissed Dr. Carley's assessment that Filthaut could work only with a number of limitations, instead adopting Dr. Lewis's conclusion that Filthaut was "capable of any work and [could] complete her sedentary job without restrictions." Dr. Lewis does not explicitly state how he reached a conclusion standing in such stark contrast to Dr. Carley's. He does, however, reference Dr. Kovar's neurologic examination, which showed no deficits and 5/5 motor strength.

Citing Department of Labor regulations providing that the claims administrator "shall consult with a health care professional" when deciding an appeal, 29 C.F.R. § 2560.503-1(h)(3)(iii), the Plan argues that the "the administrator was not required to have [Filthaut] examined and the decision to rely upon the seven physicians with whom it consulted cannot be deemed arbitrary and capricious." But the DOL only "sets forth *minimum* requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." *Id.* § 2560.503-1(a) (emphasis added).

The Plan also asserts, more convincingly, that the claims administrator had no obligation to conduct an independent physical examination because Filthaut—not the Plan—bears the burden of proving her disability by producing objective medical evidence. We agree. Under the terms of the disability plan, if a claimant "fail[s] to furnish objective Medical Evidence for [her] condition," then the Plan "will **not** pay any Short-Term Disability Benefits." And where, as

here, a disability plan "places the burden of proving disability on a disabled employee, the employee cannot then shift this responsibility to the insurance company." *Likas v. Life Ins. Co. of N. Am.*, 222 F. App'x 481, 487 (6th Cir. 2007) (citation omitted); *Bell*, 399 F. App'x at 1000 ("[T]he Plan's decision to conduct only a file review was not improper in this case, as the Plan documents specifically placed the burden on Bell to produce objective medical documentation that supported her disability.").

In sum, we recognize that the strongest factor weighing in Filthaut's favor is that the Plan neglected to order a physical examination. *See Shaw*, 795 F.3d at 550 ("Because chronic pain is not easily subject to objective verification, the Plan's decision to conduct only a file review supports a finding that the decision-making was arbitrary and capricious."). Although "plans generally are not obligated to order additional medical tests, in cases such as this, plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefit determinations." *Elliott*, 473 F.3d at 621. But this court has rejected the "assertion that a plan with *authority* to order additional medical tests [is] *required* to do so." *Id.* (citing *Calvert*, 409 F.3d at 296). And there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert*, 409 F.3d at 296; *see also Bennett*, 514 F.3d at 558–59 (6th Cir. 2008) (Cook, J., concurring). Ultimately, by the terms of the disability plan, Filthaut bears the burden of proving her disability by providing objective medical evidence of her condition—something she failed to do.

*(d) Relying on Physician Consultants*

*Shaw* determined that a reviewing physician's "track record" of being "questioned in numerous federal cases" supported a finding that the claims administrator did not engage in deliberate and principled reasoning. *Shaw*, 795 F.3d at 551. We have reviewed the federal cases

in which the independent physician advisors who reviewed Claims 2 and 3 participated, and we discern no "track record" impelling us to conclude similarly here.

## IV. CONCLUSION

Filthaut failed to provide objective medical evidence showing that her condition prevented her from working her sedentary job. Thus, because "there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, . . . the decision is neither arbitrary nor capricious." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). We therefore REVERSE the district court's judgment for Filthaut on Claims 2 and 3 and direct the district court to enter an order in accordance with our opinion.

**JANE B. STRANCH, Circuit Judge, dissenting.** At issue in this ERISA case is whether AT&T Umbrella Plan No. 3 (the Plan) wrongfully denied Rebecca Filthaut's claim for short-term disability benefits. My disagreement with the majority is primarily with the ultimate outcome in the case, not with the governing standards it employs. I concur with the majority's rejection of the Plan's repeated charge that our governing precedent, *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538 (6th Cir. 2015), is "neither binding nor instructive." The Plan's contentions that *Shaw* conflicts with Supreme Court precedent and that compliance with Department of Labor regulations setting minimum standards establishes that its claim determination cannot be arbitrary or capricious are simply disingenuous. The majority opinion rightly recognizes that we analyze a denial of disability benefits under the four-factor rubric laid out in *Shaw*. Because I disagree with the result it reaches after applying those factors, I respectfully dissent. I turn to application of *Shaw*'s four factors to the record.

I.      **Ignoring favorable evidence from treating physicians**

The Plan claims to have denied Filthaut benefits for lack of objective medical documentation or findings to support her diagnosis of severe lower back pain. But when Filthaut furnished such objective documentation, the Plan either ignored the provided evidence or summarily rejected it without analysis. Thus, the Plan—the same plan that was sued in *Shaw*—once again "ignored favorable evidence from [the plaintiff's] treating physicians." *Shaw*, 795 F.3d at 548.

As the district court and the majority noted, in a March 3, 2014 exam, Filthaut's treating physician, Dr. Carley, observed that Filthaut was "unable to ambulate," listing "no work" as a functional restriction. (Maj. Op. at 3) Dr. Carley recommended that, if Filthaut was nonetheless required to work, necessary work accommodations would include breaks every five minutes; no

sitting or standing for more than five to ten minutes; no lifting over two pounds; no reaching overhead; and no bending, twisting, kneeling, or stooping. All of the reviewing physicians—and, ultimately, the Plan—either ignored this evidence or categorically rejected it as unsupported by objective evidence.

"[A] plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Shaw*, 795 F.3d at 548–49 (alteration in original) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006)). The Plan claims, and the majority opinion appears to accept (Maj. Op. at 10–12), that the reviewing physicians discounted Dr. Carley's findings because they were unsupported. But the Plan and the reviewing physicians ignored the specific medical evidence that provided the necessary support. For example, Dr. Grattan reviewed notes from physical therapy meetings while performing his file review. Those physical therapy notes indicate that Filthaut's lumbar flexion was at "50%" in early February 2014 and at "75%" in early April, covering two of the claim time periods. Dr. Grattan does not analyze or even acknowledge the documented range of motion in his report. As to Filthaut's kidney problems, Dr. Grattan's report describes a CT scan from March 7, 2013, during the period in which Filthaut's pain was returning, that showed a "hypodense structure . . . in the upper right pole of the kidney" and "cystic density adjacent to the common bile duct . . . [which] is of uncertain clinical significance." Dr. Grattan, whose area of expertise is not in nephrology, might have been justified in declining to hypothesize about the nature of those structures. His failure to even acknowledge their possible import would be less concerning if the lone reviewing nephrologist had explained the medical significance of those findings—but Dr. Friedman did not even acknowledge the existence of the structures in his report. He merely stated, "CT of the abdomen dated 03/07/13 was reviewed," and proceeded to

his conclusion that there is "no evidence of functional impairment from the nephrology standpoint."

Finally, as the majority correctly notes (Maj. Op. at 11), two of the four reviewing physicians in the claims relevant to this appeal followed the precise procedure this court declared "unreasonable" in *Shaw*: "g[iving] the treating physicians only 24 hours to respond to their requests before they made their disability decisions 'based on available medical information.'" *Shaw*, 795 F.3d at 549.

## II. Selectively reviewing treating physician evidence

"An administrator acts arbitrarily and capriciously when it 'engages in a selective review of the administrative record to justify a decision to terminate coverage.'" *Shaw*, 795 F.3d at 549 (quoting *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007)). Perhaps the most telling instance of selective review in this case is found in Dr. Xico Garcia's synopsis of Dr. Carley's treatment: "The patient states she *is* ready to go back to work and has not been able to go to physical therapy as much as she should be." (emphasis added) Dr. Carley's notes actually say, "P[atien]t states she *isn't* ready to go back yet—hasn't been able to go to physical therapy as much as she should be." (emphasis added) The majority discusses neither the clear error nor the problematic mischaracterization because Dr. Garcia's examination occurred in the context of the denied Claim 1. But subsequent physicians indicated that they reviewed and may have relied upon prior reports. Dr. Moshe Lewis, for example, noted the negative conclusions of "[m]ultiple reviewers throughout the year" in his rationale for denying Claim 3. Thus, this early misstatement of the record compounded the risk of error and contaminated the analyses of Claims 2 and 3.

### III.    Failing to conduct its own physical evaluation

The majority's analysis of the third *Shaw* factor, the failure to conduct physical examinations, ably highlights the problematic credibility determinations the reviewing physicians undertook in this case. (Maj. Op. at 14–16) To that analysis, I would only add that, while the Plan may have had "no obligation to conduct an independent physical examination," Maj. Op. at 15, this court has been clear that "the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, 'raise[s] questions about the thoroughness and accuracy of the benefits determination.'" *Shaw*, 795 F.3d at 550 (alteration in original) (quoting *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009)).

### IV.    Heavily relying on physician consultants

Neither the parties' briefs nor the district court's opinion analyzed the track records of any of the reviewing physicians other than Dr. Jamie Lee Lewis, the physician identified by name in *Shaw* as having been criticized "in numerous federal cases." *Shaw*, 785 F.3d at 551. But Dr. Lewis is not the only reviewing physician involved in this case whose work has been criticized by the federal courts. Dr. Rangaswamy, for example, who appears to specialize in hand surgery, *Smith v. Hartford Life & Accident*, No. C 11-03495, 2013 WL 394185, at *5 (N.D. Cal. Jan. 30, 2013), has issued opinions that one federal court called "cursory," *McKoy v. Int'l Paper Co.*, 488 F.3d 221, 223 (4th Cir. 2007), and that another found failed to take into account relevant evidence, *Smith*, 2013 WL 394185, at *25. It is true that other cases have accepted the opinions of these doctors and that there is no magic number of negative decisions after which a reviewing physician is no longer credible. But where, as here, other *Shaw* factors have already created doubt about the reliability of the reviewing physicians' work, it is troubling when a

defendant continues to rely on physicians who are "repeatedly retained by benefits plans," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), and whose work for those plans has also been criticized by the federal courts.

In sum, on the record before us, I think Filthaut has shown that the four *Shaw* factors, considered in their entirety, counsel in favor of finding the Plan's decision to deny disability benefits arbitrary and capricious. I therefore respectfully dissent.